UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HAMIN L. DIXON,

      Petitioner,               Case No. 2:13-cv-14826

        v.

                          UNITED STATES DISTRICT COURT JUDGE
CATHERINE BAUMAN,        GERSHWIN A. DRAIN

      Respondent.
_____/

**OPINION AND ORDER
DENYING THE AMENDED HABEAS CORPUS PETITION [DKT. NO. 18],
DENYING A CERTIFICATE OF APPEALABILITY,
AND GRANTING LEAVE TO APPEAL *IN FORMA PAUPERIS***

Petitioner Hamin L. Dixon seeks a writ of habeas corpus pursuant to 28

U.S.C. § 2254. (Dkt. No. 18). The amended petition challenges Petitioner's state

convictions for attempted murder, MICH. COMP. LAWS § 750.91, conspiracy to

poison or intimidate a witness, MICH. COMP. LAWS § 750.157a, poisoning a drink,

MICH. COMP. LAWS § 750.436(1)(a), and witness intimidation, MICH. COMP. LAWS

§ 750.122. Petitioner raises several issues regarding his right of confrontation, the

sufficiency of the evidence at his trial, his right not to be placed in double

jeopardy, the prosecutor's conduct, his trial attorney's deficient performance, and

1

the admission of evidence about a gun and bullets. None of these claims warrant habeas relief. Accordingly, the amended petition will be denied.

## I. Background

### A. The Charges, Trial, and Sentence

The charges against Petitioner arose from allegations that he tried to prevent the mother of two of his children (Rosemarie Lowery) from testifying against him in a home-invasion case. The state court summarized the facts as follows:

> On February 10, 2009, defendant was arrested on charges of home invasion and conspiracy to interfere with wireless communications following a domestic altercation between defendant and Rosemarie Lowery. After his arrest, defendant had a series of conversations with his girlfriend, Daycee Caughill, regarding how Lowery could be prevented from testifying at defendant's preliminary examination. On March 1, 2009, Caughill purchased a bottle of cognac and spiked it with a number of prescription painkillers (Darvocet) before leaving it on Lowery's front porch. Caughill was arrested and charged with attempted murder after an officer accidentally stumbled upon incriminating recordings of jail telephone calls between defendant and Caughill.

*People v. Dixon*, No. 300575, 2011 WL 6187063, at *1 (Mich. Ct. App. Dec. 13, 2011) (unpublished).

The charges against Caughill were later reduced to poisoning, conspiracy to poison, and witness intimidation. At her preliminary examination, the prosecution added a charge of assault with intent to do great bodily harm less than murder, and she pleaded guilty to all four charges.

Petitioner was charged with the attempted murder of Rosemarie Lowery and/or her father Jerry Lowery, conspiracy to murder Rosemarie Lowery and/or Jerry Lowery, poisoning a drink, and witness intimidation. He was tried in St. Clair County Circuit Court where Ms. Lowery testified that Petitioner had entered her home without permission on August 10, 2009, and then choked her and grabbed the cell phone that she was using to call for help. Ms. Lowery also testified that, before Petitioner's preliminary examination in the home-invasion case, her son found a bottle of Hennessy cognac and a can of Red Bull on their front porch. Her father drank the liquid, thinking that it was her liquor.

Jerry Lowery testified that he was residing with his daughter Rosemarie on August 10, 2009, and that when he saw Petitioner choking his daughter that day, he armed himself with a bat and ordered Petitioner to leave. At some point, his grandson found a bottle of Hennessy cognac on their porch. There was a cloudy substance at the bottom of the bottle, and after he drank about half of the liquid, he felt dizzy and his nose bled a little bit. He went to the hospital, but he was released the same day. Denise Caughill testified that she turned over her supply of Darvocet to a detective and that she never gave any of her Darvocet pills to her daughter Daycee.

Dr. Felix Adatsi was a toxicologist for the Michigan State Police. He testified that when an individual takes more than the therapeutic amount of Darvocet, the drug can become toxic and lead to organ failure and bodily shutdown. According to Dr. Adatsi, a person's reaction would be substantially worse if Darvocet were consumed with alcohol.

Daycee Caughill testified that Petitioner called his cousin "Cuz" and that "Cuz" was a mediator between Petitioner and Rosemarie Lowery on the home-invasion charges. While Petitioner was in jail, he directed Ms. Caughill by phone or letter to have Cuz tell Ms. Lowery that Petitioner would pay her in four installments to sweeten the deal and get the charges dropped. Petitioner also directed Ms. Caughill to ask a lawyer how someone could drop charges and what would happen if witnesses did not appear in court. In other phone calls, Petitioner told Ms. Caughill to give Ms. Lowery a beverage consisting of Hennessy cognac with Red Bull and some pills. Ms. Caughill subsequently stole twenty-one Darvocet pills from her mother, crushed about eleven of the pills, and put the crushed substance in the cognac. Her intent was to have Ms. Lowery drink the liquid and become too sick to go to court.

Tony Bennett testified that he was a federal prisoner who was housed in the St. Clair County Jail in February or March of 2009. While he was there, he met

Petitioner who talked to him about a breaking and entering that he did not commit and how he was worried about his baby's mother testifying against him in court. In late February or early March, Petitioner asked Bennett how to get rid of, or kill, his baby's mother so that she could not go to court and testify against him. Petitioner was talking about putting something in a drink. At a later date, Petitioner told Bennett that his girlfriend had taken a bottle of Hennessy liquor mixed with Darvocet pills to the victim's home and left the bottle on the front porch. Petitioner also told Bennett that he tried to get his girlfriend to pick up a pistol or some shells, which Petitioner had called "escargot" in a coded phone call. Bennett admitted at Petitioner's trial that he was awaiting sentencing in his own case, but he denied asking anyone for anything in exchange for his testimony.

Police Officer Matt Finnie testified that, on March 3, 2009, he confiscated five .38 caliber rounds from the home of Petitioner's sister. He did not find a firearm.

Detective John Stuewer explained to the jury how he discovered Petitioner's jailhouse calls to Daycee Caughill. In one of the calls, Petitioner appeared to be asking Ms. Caughill to put a harmful substance in a bottle and to leave the bottle at a witness's home.

Detective Stuewer also testified about searching Ms. Caughill's residence and finding incriminating letters which Petitioner had written to Caughill, as well as, a legal pad on which there were questions about how a person could recant a statement. At Ms. Lowery's home, Detective Stuewer collected a bottle of Hennessy and a can of Red Bull, and at Ms. Caughill's parents' home, he found three bottles of Darvocet.

At the close of the prosecution's proofs, defense counsel moved for a directed verdict of acquittal on the four charges and particularly on the attempted-murder and conspiracy charges. The trial court denied the motion as to the attempted-murder charge, but postponed a ruling on the conspiracy charge. The parties subsequently agreed to amend the conspiracy count to change it from conspiracy to commit murder to conspiracy to poison or to intimidate a witness.

Petitioner did not testify or present any witnesses. His defense was that, although he may have been guilty of conspiracy, poisoning, and witness intimidation, he had no intent to kill and, therefore, he was not guilty of attempted murder. He did not dispute the fact that he wrote the letters in evidence to Daycee Caughill and that he called her from jail using another inmate's identification. But he maintained that Ms. Caughill was the principal actor in the crimes and that he should not be held more accountable than her.

On September 16, 2009, the jury found Petitioner guilty of attempted murder, conspiracy to poison or intimidate a witness, poisoning, and witness intimidation. On October 19, 2009, the trial court sentenced Petitioner as a fourth habitual offender to four concurrent terms of twenty-two and a half to forty years in prison.

## B. The Direct Appeal and Initial Petition

On direct appeal from his convictions, Petitioner argued through counsel that his right of confrontation and his right to present a defense were violated by the trial court's refusal to permit him to cross-examine prosecution witness Tony Bennett on whether Bennett hoped to obtain a departure from his sentencing guidelines in his federal case in return for his cooperation in Petitioner's case. In a *pro se* supplemental brief, Petitioner raised more than a dozen additional claims.

The Michigan Court of Appeals determined that the trial court did not abuse its discretion by foreclosing Petitioner from cross-examining Bennett about his expectations of a downward departure in his sentencing guidelines and that Petitioner's *pro se* issues lacked merit. Accordingly, the Court of Appeals affirmed Petitioner's convictions in an unpublished, *per curiam* opinion. *See Dixon*, 2011 WL 6187063. On October 22, 2012, the Michigan Supreme Court

denied leave to appeal because it was not persuaded to review the issues. *See People v. Dixon*, 493 Mich. 867; 821 N.W.2d 544 (2012).

On November 22, 2013, Petitioner commenced this action, raising ten claims in a *pro se* petition for the writ of habeas corpus. (Dkt. No. 1). In an answer to the petition, Respondent argued, among other things, that Petitioner had not exhausted state remedies for three of his claims. (Dkt. No. 8). Petitioner then moved for a stay so that he could return to state court and pursue additional state remedies. (Dkt. No. 13). On February 23, 2015, the Court granted Petitioner's motion for a stay and closed this case for administrative purposes. (Dkt. No. 15).

## C. The Post-Conviction Proceedings, Amended Petition, and Supplemental Answer

Petitioner subsequently filed a motion for relief from judgment in the state trial court. The trial court denied Petitioner's motion on grounds that Petitioner's claims lacked merit and that Petitioner had failed to show cause for not raising the claims on direct appeal. *See People v. Dixon*, No. 09-001342-FC (St. Clair Cty. Cir. Ct. June 5, 2015). Petitioner appealed the trial court's decision, but the Michigan Court of Appeals denied leave to appeal for failure to establish entitlement to relief under Michigan Court Rule 6.508(D). *See People v. Dixon*, No. 330511 (Mich. Ct. App. Mar. 31, 2016). On November 30, 2016, the

Michigan Supreme Court denied leave to appeal for the same reason. *See People v. Dixon*, 500 Mich. 897; 887 N.W.2d 401 (2016).

On March 2, 2017, Petitioner returned to this Court and filed an amended petition for the writ of habeas corpus (Dkt. No. 18) and a motion to re-open this case (Dkt. No. 17). The Court granted Petitioner's motion on June 5, 2017 (Dkt. No. 20), and on September 1, 2017, Respondent filed a supplemental answer. (Dkt. No. 21). Finally, on December 7, 2017, Petitioner filed a reply brief. (Dkt. No. 25).

Respondent argues, among other things, that Petitioner's fifth claim is barred by the habeas statute of limitations and that the fifth and sixth claims are procedurally defaulted. The habeas statute-of-limitations defense is not jurisdictional. *Holland v. Florida*, 560 U.S. 631, 645 (2010) (quoting *Day v. McDonough*, 547 U.S. 198, 205 (2006)). A procedural default also is not a jurisdictional matter, *Trest v. Cain*, 522 U.S. 87, 89 (1997), and the Court finds no merit in Petitioner's claims. Accordingly, in the interest of judicial economy, the Court bypasses the procedural-default analysis and the statute-of-limitations issue and proceeds directly to the merits of Petitioner's claims, using the following legal framework.

## II. Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires habeas petitioners who challenge "a matter 'adjudicated on the merits in State court' to show that the relevant state court 'decision' (1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' or (2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.'" *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) (quoting 28 U.S.C. § 2254(d)). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and 'demands that state-court decisions be given the benefit of the doubt,' *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)." *Renico v. Lett*, 559 U.S. 766, 773 (2010).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting

*Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103. A state-court's factual determinations are presumed correct on federal habeas review, 28 U.S.C. § 2254(e)(1), and review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## III. ANALYSIS

### A. Claim One: Denial of the Right of Confrontation

Petitioner alleges that the trial court violated his right of confrontation and his right to present a defense by not permitting him to cross-examine jailhouse informant Tony Bennett about Bennett's motivation for testifying against Petitioner. Although Bennett pleaded guilty to federal charges months before Petitioner was charged in the case at issue here, defense counsel wanted to ask Bennett whether he hoped for leniency at his future sentencing as a result of his testimony in Petitioner's case. The trial court precluded defense counsel from questioning Bennett about his motivation for testifying. The court stated that any offer to depart downward from Bennett's sentencing guidelines was not related to

Petitioner's case and that Bennett's cooperation in Petitioner's case could not have been anticipated when Bennett pleaded guilty in federal court. (9/10/09 Trial Tr., pp. 335-45, Dkt. No. 22-9, Page ID 925-28).

The Michigan Court of Appeals adjudicated Petitioner's constitutional claim on direct appeal and stated that,

> [w]hile it could plausibly be argued that even speculative or unreasonable hope for additional leniency in an unrelated case could motivate a witness pending sentencing to fabricate testimony, without firm evidence of a deal for, or even potential for, such leniency, the trial court was well within its discretion in foreclosing the desired avenue of inquiry.

*Dixon*, 2011 WL 6187063, at *1.

### 1. Clearly Established Federal Law

"[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane v. Kentucky,* 476 U.S. 683, 690 (1986) (quoting *California v. Trombetta,* 467 U.S. 479, 485 (1984)). Only rarely, however, has the Supreme Court "held that the right to present a complete defense was violated by the exclusion of defense evidence under a state rule of evidence." *Nevada v. Jackson*, 569 U.S. 505, 509 (2013).

The Constitution also guarantees an accused in a criminal prosecution the right "to be confronted with the witnesses against him." U.S. CONST. amend. VI. This right "includes the right to cross-examine witnesses," *Richardson v. Marsh*,

481 U.S. 200, 206 (1987) (citing *Pointer v. Texas*, 380 U.S. 400, 404, 406-07

(1965)), and to question one's "accusers about potential sources of bias or motives

to lie." *Batey v. Haas*, 573 F. App'x 590, 593 (6th Cir.  2014) (citing *Davis v.

Alaska*, 415 U.S. 308, 316-17 (1974)).

A defendant's right to confront the witnesses against him, however, is not

absolute.  *United States v. Davis*, 430 F.3d 345, 360 (6th Cir. 2005).  Thus, the

Confrontation Clause does not prevent

> a trial judge from imposing any limits on defense counsel's inquiry
> into the potential bias of a prosecution witness.  On the contrary, trial
> judges retain wide latitude insofar as the Confrontation Clause is
> concerned to impose reasonable limits on such cross-examination
> based on concerns about, among other things, harassment, prejudice,
> confusion of the issues, the witness' safety, or interrogation that is
> repetitive or only marginally relevant.

*Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).  "Generally speaking, the

Confrontation Clause guarantees an *opportunity* for effective cross-examination,

not cross-examination that is effective in whatever way, and to whatever extent,

the defense might wish."  *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985)

(emphasis in original).  When, as in this case, it is merely the *extent* of cross-

examination that is limited, the trial judge retains considerable discretion.  *Dorsey

v. Parker*, 872 F.2d 163, 167 (6th Cir. 1989).  "If a trial court has curtailed cross-

examination from which a jury could have assessed a witness's bias, prejudice or

motive to testify," "a reviewing court must assess whether the jury had enough information, despite the limits placed on otherwise permitted cross-examination, to assess the defense theory of bias or improper motive." *Boggs v. Collins*, 226 F.3d 728, 739 (6th Cir. 2000).

## 2. Application

During an offer of proof made in the jury's absence, defense counsel asked Bennett whether he might try to receive a downward departure in his federal sentencing guidelines for helping to convict Petitioner. Bennett responded, "I'm always hoping for the best . . . ." (9/10/09 Trial Tr., at 344, Dkt. No. 22-9, Page ID 927.) Although this comment suggests that Bennett may have had an ulterior motive for testifying against Petitioner, the trial court precluded defense counsel from questioning Bennett about his reasons for testifying.

Nevertheless, Bennett testified in the jury's presence that he had pleaded guilty over a year earlier and that he was awaiting sentencing on federal charges at the time of Petitioner's trial. *Id*., at 335-36, Page ID 925. The jurors also were made aware that defense counsel wanted to explore the possibility that Bennett was cooperating in Petitioner's case in the hope that he would receive a reduction in his anticipated federal sentence. *Id*., at 337-39, Page ID 926. Furthermore, Bennett admitted that, after he learned from Petitioner that someone might be harmed, he

(Bennett) contacted his attorney and his federal agent instead of alerting jail officials about the potential harm to a third party. *Id.*, at 346-48, Page ID 928.

The jurors could have speculated from the admissible evidence that Bennett was hoping to receive some kind of benefit from testifying against Petitioner and that his testimony was not entirely the result of concern for Petitioner's intended victim. Therefore, even though Bennett denied receiving any benefit for his testimony, the jury had enough information to assess the defense theory that Bennett had an improper motive for testifying. *Boggs*, 226 F.3d at 739.

Even if a constitutional error occurred, Confrontation-Clause errors are subject to harmless-error analysis, *Van Arsdall*, 475 U.S. at 684, and there was substantial evidence of Petitioner's guilt apart from Bennett's testimony. For example, when Petitioner was unable to convince Ms. Lowery to dodge a subpoena or to accept a bribe for not testifying in his home-invasion case, he told Ms. Caughill that more drastic measures would have to be taken. He referred to "skull and crossbones" as the type of substance that had to be used in the liquid left at Ms. Lowery's home, *id.*, at 411-12, Page ID 944, and it is apparent from a recording of one of his phone calls to Ms. Caughill that he and Ms. Caughill had discussed using Darvocet in the drink, *id.* at 438-39, Page ID 951. After Ms. Caughill told Petitioner that she put twenty-one Darvocet pills in the drink,

Petitioner was concerned that twenty-one pills was not enough. *Id.*, at 291, Page ID 914. Finally, he wanted Ms. Caughill to acquire the gun and ammunition from his sister's home. *Id.*, at 450-53, Page ID 954-55.

To conclude, the jury had sufficient evidence with which to evaluate Bennett's credibility, and even if defense counsel had been permitted to question Bennett about his hope for leniency at his sentencing in return for testifying against Petitioner, the jury in all likelihood would have convicted Petitioner anyway. Thus, any alleged constitutional errors were harmless because they could not have had a "substantial and injurious effect" on the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).

**B. Claim Two: Insufficient Evidence of Attempted Murder**

Petitioner alleges that the prosecutor presented insufficient evidence to support his conviction for aiding and abetting attempted murder and that his appellate attorney was ineffective for failing to raise this claim on direct appeal. Petitioner argues that Ms. Caughill lacked the specific intent to murder and that he did nothing to commit the offense and was, in fact, in jail when the alleged crimes were committed. The state trial court found no merit in this claim and also determined that appellate counsel was not ineffective for failing to raise the claim on direct appeal.

## 1. Clearly Established Federal Law

The Due Process Clause of the United States Constitution "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). Following *Winship*, the critical inquiry on review of a challenge to the sufficiency of the evidence supporting a criminal conviction is

> whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (internal citations and footnote omitted) (emphases in original).

The Supreme Court has "made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (*per curiam*). First, it is the responsibility of the jury to decide what conclusions should be drawn from

the evidence admitted at trial. *Id*. (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (*per curiam*)). "And second, on habeas review, 'a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id*. (quoting *Cavazos*, 565 U.S. at 2); *see also Tanner v. Yukins*, 867 F.3d 661, 672 (6th Cir. 2017) (explaining that "two layers of deference apply [to a sufficiency-of-the-evidence claim], one to the jury verdict, and one to the state appellate court"), *cert. denied*, 138 S. Ct. 1283.

## 2. Application

The *Jackson* standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n. 16. In Michigan, the statute proscribing attempted murder, MICH. COMP. LAWS § 750.91, provides, in pertinent part:

> Any person who shall attempt to commit the crime of murder by poisoning, drowning, or strangling another person, or by any means not constituting the crime of assault with intent to murder, shall be guilty of a felony, punishable by imprisonment in the state prison for life or any term of years.

MICH. COMP. LAWS § 750.91. "[A] conviction of attempted murder requires a showing that the defendant intended to bring about a death and may not be based

on a defendant's negligent or reckless actions." *People v. Long*, 246 Mich. App. 582, 589, 633 N.W.2d 843, 847–48 (2001)(internal quotation omitted). Petitioner was charged on an aiding-and-abetting theory.

> The phrase "aids or abets" is used to describe any type of assistance given to the perpetrator of a crime by words or deeds that are intended to encourage, support, or incite the commission of that crime. To show that an individual aided and abetted the commission of a crime, the prosecution must establish that (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement.

*People v. Henderson*, 306 Mich. App. 1, 10; 854 N.W.2d 234, 240–41 (2014) (internal quotation marks and citations omitted).

The evidence at trial established that Petitioner asked Ms. Caughill to prepare a liquid consisting of Ms. Lowery's favorite drink (Hennessy cognac with Red Bull) and some pills and then put the liquid on the bottom step of Ms. Lowery's porch.  (9/10/09 Trial Tr., at 271-72, 275, 282, Dkt. No. 22-9, Page ID 909-10, 912).  There was additional evidence that, after Ms. Caughill spiked the Hennessy with Darvocet, she informed Petitioner that she had used something they had previously discussed.   Petitioner then said that he hoped twenty-one pills were sufficient.  *Id*., at 291, Page ID 914.  Although Ms. Caughill testified that it was a practical joke at first, that it was her idea to add the Darvocet to the liquid, and that

her intent was to keep Ms. Lowery from going to court, *id*., at 270-71, 279-81, 293-94, Page ID 909, 911-12, 915), she also admitted that she still loved Petitioner and that she would marry him if that were possible. *Id*., at 311, Page ID 919. The jury could have concluded that she was biased in favor of Petitioner and that she was trying to minimize Petitioner's conduct.

Tony Bennett, moreover, testified that Petitioner asked him how to get rid of, or kill, his baby's mother. *Id.,* at 326, Page ID 923. Petitioner also told Bennett that his girlfriend put "20 something" Darvocet pills in the liquor, *id*. at 329, Page ID 924, and Dr. Adatsi testified that twenty-one pills of Darvocet could be toxic, cause cardiac arrhythmia, and make a person comatose when combined with alcohol. (9/9/09 Trial Tr., at 212-24, Page ID 894-897.)

A rational trier of fact could have concluded from the evidence summarized above that Petitioner aided and abetted Ms. Caughill in attempting to murder Ms. Lowery by poisoning her. In addition, the state court's conclusion that Petitioner's claim lacked merit was not contrary to, or an unreasonable application of, *Jackson*. Petitioner, therefore, has no right to relief on the basis of his challenge to the sufficiency of the evidence.

## C. Claim Three: Double Jeopardy

Petitioner contends that his convictions for poisoning and attempted murder by poisoning violated his right not to be placed in double jeopardy because the proofs used to establish the two crimes were the same. According to Petitioner, the elements for poisoning were subsumed in the attempted-murder charge. The Michigan Court of Appeals found no merit in this claim and concluded that the two convictions did not violate double jeopardy principles.

The Double Jeopardy Clause of the Fifth Amendment states that "[n]o person shall be . . . subject for the same offence to be twice put in jeopardy of life or limb . . . ." U.S. CONST. amend. V. The Clause is "applicable to the States through the Fourteenth Amendment," and "it protects against successive prosecutions for the same offense after acquittal or conviction and against multiple criminal punishments for the same offense." *Monge v. California*, 524 U.S. 721, 727–28 (1998) (citing *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969)). The provision against multiple punishments is at issue here.

> What determines whether the constitutional prohibition against multiple punishments has been violated is the state legislature's intent concerning punishment. Specifically, with respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended.

*Jackson v. Smith*, 745 F.3d 206, 211 (6th Cir. 2014) (internal quotation marks and

citation omitted).

> In *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed.
> 306 (1932), the Supreme Court developed the "same elements" test to
> determine whether Congress has authorized cumulative punishments:
> The applicable rule is that, where the same act or transaction
> constitutes a violation of two distinct statutory provisions, the test to
> be applied to determine whether there are two offenses or only one, is
> whether each provision requires proof of a fact which the other does
> not. The *Blockburger* test, however, is a rule of statutory
> construction, not a constitutional test in and of itself [.] . . . . As a
> result, the *Blockburger* test does not necessarily control the inquiry
> into the intent of a state legislature. Even if the crimes are the same
> under *Blockburger,* if it is evident that a state legislature intended to
> authorize cumulative punishments, a court's inquiry is at an end.

> Moreover, when assessing the intent of a state legislature, a federal
> court is bound by a state court's construction of that state's own
> statutes . . . . Thus, for purposes of double jeopardy analysis, once a
> state court has determined that the state legislature intended
> cumulative punishments, a federal habeas court must defer to that
> determination. *Id.*

*Volpe v. Trim*, 708 F.3d 688, 696–97 (6th Cir. 2013) (internal quotation marks and

citations omitted), as amended on denial of reh'g (Jan. 31, 2013) (footnote

omitted).

Poisoning involves "[w]illfully mingl[ing] a poison or harmful substance

with a . . . drink . . . knowing or having reason to know that the . . . drink . . . may

be ingested or used by a person to his or her injury." Mich. Comp. Laws §

750.436(1)(a). Attempted murder, on the other hand, involves trying to kill

another person by poisoning or other means. Mich. Comp. Laws § 750.91. A person can poison another person and even attempt to injure the person without trying to kill the other person. Therefore, attempted murder requires proof of a fact (intent to kill) that poisoning does not.

Furthermore, the Michigan Court of Appeals reasonably concluded on review of Petitioner's claim that the State Legislature intended to impose cumulative punishments for the two crimes in question. Because this Court must defer to the state court's determination of the State Legislature's intent, *Volpe*, 708 F.3d 697, the Court's inquiry is at an end. Petitioner has no right to relief on the basis of his double-jeopardy claim.

## D. Claim Four: Selective Prosecution

Petitioner points out that, although he was charged with aiding and abetting Daycee Caughill in attempting to murder Rosemarie or Jerry Lowery, Caughill was not charged with attempted murder even though she was the principal actor. Petitioner concludes from this fact that the prosecutor selectively prosecuted him for attempted murder. The Michigan Court of Appeals concluded on review of his claim that

> defendant's assertions of improper motivation on the part of the
> prosecutor are entirely speculative and premised on invalid reasoning.
> First, defendant was not improperly charged. Second, even if he
> were, it does not necessarily follow that the motivation for doing so

was defendant's family, race, gender, and past history. *Dixon*, 2011 WL 6187063, at *4 n. 1.

Under the Supreme Court's "selective prosecution doctrine, 'the decision to prosecute may not be deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification, including the exercise of protected statutory and constitutional rights.'" *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 497 (1999) (Ginsburg, J., concurring in part and concurring in the judgment) (quoting *Wayte v. United States,* 470 U.S. 598, 608 (1985)). "The requirements for a selective-prosecution claim draw on 'ordinary equal protection standards.' The claimant must demonstrate that the . . . prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *United States v. Armstrong*, 517 U.S. 456, 465 (1996) (quoting *Wayte*, 470 U.S. at 608). Furthermore,

> [b]ecause such claims invade a special province of the Executive - its prosecutorial discretion - [the Supreme Court has] emphasized that the standard for proving them is particularly demanding, requiring a criminal defendant to introduce "clear evidence" displacing the presumption that a prosecutor has acted lawfully.

*Reno*, 525 U.S. at 489 (citing *Armstrong*, 517 U.S. at 463-65).

Petitioner stated at a pretrial motion hearing that his case had racial undertones because he was a black male and his alleged co-conspirator was a white female. *(9/3/09 Mot. Hr'g, at 5-6, Dkt. No. 22-7, Page ID 825-26).* The prosecutor, however, implied at Petitioner's trial that Petitioner was charged with a more serious crime than Daycee Caughill because of Petitioner's criminal record and because certain evidence was admissible against him, but not admissible against Ms. Caughill. ( 9/10/09 Trial Tr., at 302-05, Dkt. No. 22-9, Page ID 917-18; 9/15/09 Trial Tr., at 538-39, Dkt. No. 22-11, Page ID 983). There is no evidence in the record that the prosecutor's charging decision was based on race, gender, or any other discriminatory basis. Thus, the state appellate court's rejection of Petitioner's claim as speculative and premised on invalid reasoning was objectively reasonable, and Petitioner is not entitled to habeas relief as a result of his selective-prosecution claim.

## E. Claim Five: Duplicitous Count

Petitioner alleges that he was denied his right to due process and his right to a unanimous jury verdict because the attempted-murder count was duplicitous. According to Petitioner, the count was duplicitous because it was based on an attempt to murder either Rosemarie Lowery or her father Jerry Lowery or both of

them. Petitioner asserts that the jury may not have unanimously agreed on which victim he supposedly attempted to murder.

Petitioner first raised this claim in his motion for relief from judgment, which the trial court denied for lack of merit and because Petitioner failed to show cause for his failure to raise the claim on direct appeal. Petitioner, nevertheless, argues that his appellate attorney was ineffective for not raising this issue.

The United States Court of Appeals for the Sixth Circuit has explained that:

> [A]n indictment is duplicitous if it sets forth separate and distinct crimes in one count. The overall vice of duplicity is that the jury cannot in a general verdict render its finding on each offense, making it difficult to determine whether a conviction rests on only one of the offenses or on both. A general verdict of guilty will not reveal whether the jury found the defendant guilty of one crime and not guilty of the others, or guilty of all. The yardstick in determining whether there is duplicity or multiplicity is whether one offense or separate offenses are charged and . . . this is a difficult and subtle question. The test announced most often in the cases is that offenses are separate if each requires proof of an additional fact that the other does not.

*United States v. Davis*, 306 F.3d 398, 415–16 (6th Cir. 2002) (internal quotation marks and citations omitted).

"The Supreme Court has never held that an indictment containing duplicitous counts violates the Due Process Clause." *Santilus v. Heath*, No. 11-CV-5703, 2014 WL 5343817, at *2 (E.D. N.Y. Oct. 20, 2014) (unpublished

decision citing *Jones v. Lee,* No. 10 CIV. 7915, 2013 WL 3514436, at *7 (S.D. N.Y. July 12, 2013)). Thus, the mere presence of duplicitous charges cannot provide a basis for habeas relief." *Id*.

Even assuming that Petitioner's allegation is cognizable on habeas review, the first count of the criminal information charged Petitioner with only one offense: attempted murder. As such, it was not duplicitous.

The trial court did charge the jurors that, to find Petitioner guilty of the count, they had to find that Petitioner intended to introduce a substance into Rosemarie Lowery and/or Jerry Lowery's body and must have intended to kill Rosemarie Lowery and/or Jerry Lowery. (9/16/09 Trial Tr., at 557, Page ID 988). But a single count that charges the defendant with harming more than one victim is not necessarily duplicitous. *See United States v. Bryan*, 868 F.2d 1032, 1037 (9th Cir. 1989) (citing *United States v. Mastelotto,* 717 F.2d 1238 (9th Cir. 1983), for the principle that a single count alleging that the defendant schemed to defraud a variety of victims is not necessarily duplicitous). Petitioner is not entitled to habeas relief on this claim.

**F. Claim Six: Improper Amendment of Count Two**

Petitioner alleges that the trial court violated his right to due process by allowing the prosecutor to amend count two to charge Petitioner with conspiracy to

poison or conspiracy to intimidate a witness instead of conspiracy to commit first-degree murder.  Petitioner further alleges that his trial attorney was ineffective for failing to object to the amendment, and appellate counsel was ineffective for failing to raise the issue of trial counsel's ineffectiveness.  The Michigan Court of Appeals found no merit in this claim.

In Michigan, the document known as a criminal information "advise[s] an accused of the offense with which he is charged."  *People v. Gould*, 237 Mich. 156, 164; 211 N.W.2d. 346, 348 (1926).  Before, during, or after trial, a trial court "may permit the prosecutor to amend the information . . . unless the proposed amendment would unfairly surprise or prejudice the defendant."  Mich. Ct. R. 6.112(H); *see also* Mich. Comp. Laws § 767.76 ("The court may at any time before, during or after the trial amend the indictment in respect to any defect, imperfection or omission in form or substance or of any variance with the evidence.").  In light of these principles, it was not improper to allow the prosecution to amend count two of Petitioner's criminal information during Petitioner's trial.

Even if the trial court had violated MICH. COMP. LAWS § 767.76 and Mich. Ct. R. 6.112(H), "federal habeas corpus relief does not lie for errors of state law." *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  "In conducting habeas review, a

federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). In fact, when the gravamen of the petitioner's claim is that state law was violated by amendment of the information, the claim is not cognizable in a habeas corpus proceeding. *King v. Girubino*, 538 F. Supp.2d 1269, 1271, 1278-79 (C.D. Cal. 2008).

The Sixth Amendment, however, provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation." U.S. CONST., amend. VI. Further, "[t]he due process clause of the Fourteenth Amendment mandates that whatever charging method the state employs must give the criminal defendant fair notice of the charges against him to permit adequate preparation of his defense." *Koontz v. Glossa*, 731 F.2d 365, 369 (6th Cir. 1984).

Here, Petitioner initially was charged with conspiracy to commit murder through poisoning. He was also charged in separate counts with poisoning and witness intimidation. Given the nature of the initial charges, the Michigan Court of Appeals reasonably concluded that "the amendment from conspiracy to commit attempted murder by poisoning to conspiracy to commit poisoning did not constitute the sort of drastic change that would result in unfair surprise, inadequate

notice, or insufficient opportunity to mount a defense." *Dixon*, 2011 WL 6187063, at *6.

Furthermore, the state district court stated at the close of the preliminary examination that, if at some point the prosecutor charged Petitioner with conspiracy to poison, there was sufficient testimony to support that charge also. (5/8/09 Prelim. Examination Tr., at 36, Dkt. No. 22-4, Page ID 801). Thus, Petitioner had notice that the prosecutor might amend count two to charge him with conspiracy to poison, and his challenge to the amendment lacks merit.

Finally, although Petitioner contends in his habeas petition that his trial attorney was ineffective for failing to object to the amendment, the amendment actually benefitted Petitioner because it reduced the maximum possible penalty on count two from life imprisonment to fifteen years. (9/11/09 Trial Tr., at 488, Page ID 969). Under the circumstances, trial counsel was not ineffective for failing to object to the amendment to count two, and appellate counsel was not ineffective for failing to raise a claim about trial counsel's performance.

## G. Claim Seven: Ineffective Assistance of Trial Counsel

Petitioner alleges that his trial attorney was ineffective for conceding Petitioner's guilt on counts two through four (conspiracy, poisoning, and witness intimidation). Petitioner contends that defense counsel's comment that he would

be completely comfortable with the jury finding him guilty on those counts, *see* 9/15/09 Trial Tr., at 534, Dkt. No. 22-11, page ID 982, opened the door for the prosecutor to interject comments about her charging decision, Petitioner's criminal record, and other facts not in evidence. The Michigan Court of Appeals found no merit in Petitioner's claim.

### 1. Clearly Established Federal Law

To prevail on his ineffective-assistance-of-counsel claim, petitioner must show "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The deficient-performance prong "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. Petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id*. at 688.

The "prejudice" prong "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. A defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

"[C]ounsel has wide latitude in deciding how best to represent a client, and deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. . . . Judicial review of a defense attorney's summation is therefore highly deferential – and doubly deferential when it is conducted through the lens of federal habeas." *Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) (*per curiam*).

## 2. Application

An attorney is not automatically ineffective for conceding the defendant's guilt. *Florida v. Nixon*, 543 U.S. 175, 189-92 (2004). By candidly acknowledging a client's shortcomings, an attorney can build credibility with the jury and possibly persuade the jury to focus on the relevant issues in the case. *Gentry,* 540 U.S. at 9. An attorney "cannot be deemed ineffective for attempting to impress the jury with his candor and his unwillingness to engage in 'a useless charade.'" *Nixon*, 543 U.S. at 192 (citing *United States v. Cronic*, 466 U.S. 648, 656 n. 19 (1984)).

In this case, moreover, there was overwhelming evidence of Petitioner's guilt on counts two through four. Accordingly, it was reasonable trial strategy to focus on the attempted-murder count and hope to persuade the jury to acquit

Petitioner of the most serious charge even if that meant finding Petitioner guilty of the lesser accounts. A decision to concede guilt on a lesser charge can be "a reasonable tactical retreat rather than a complete surrender," *Lingar v. Bowersox,* 176 F.3d 453, 459 (8th Cir. 1999), and it is a sound and reasonable tactic when there is overwhelming evidence of the defendant's guilt, *Bell v. Evatt*, 72 F.3d 421, 429 (4th Cir. 1995), and the count in question is a lesser count, *Underwood v. Clark,* 939 F.2d 473, 474 (7th Cir. 1991). Moreover, this is not a case where the defendant vociferously insisted that he did not engage in the charged acts and adamantly objected to any admission of guilt. *See McCoy v. Louisiana*, 138 S.Ct. 1500, 1505 (2018).

The Michigan Court of Appeals concluded that defense counsel's strategy "was legitimate trial strategy and a reasonable attempt to spare defendant from the most serious of the four crimes he was charged with." *Dixon*, 2011 WL 6187063, at *6. This conclusion was objectively reasonable.

## H. Claim Eight: Insufficient Evidence of Aiding and Abetting Poisoning

Petitioner claims that the prosecution failed to establish sufficient evidence that he aided and abetted Ms. Caughill in poisoning Rosemarie or Jerry Lowery. Petitioner asserts that there was no evidence that he encouraged Caughill to procure or mingle the pain medication with a drink. "The poisoning charge

33

required proof that a person willfully mingled a poison or harmful substance with a drink, knowing or having reason to know that another person may ingest it to his or her injury." *People v. Jackson*, No. 260313, 2006 WL 1652705, at *2 (Mich. Ct. App. June 15, 2006) (unpublished case citing Mich. Comp. Laws § 750.436(1)(a)). Tony Bennett testified at Petitioner's trial that Petitioner asked him how to poison his baby's mother so that she could not go to court and testify against him. In a phone call to Ms. Caughill, Petitioner directed Caughill to give Ms. Lowery a beverage consisting of Hennessy cognac with Red Bull and some pills. Ms. Caughill testified that she crushed about eleven Darvocet pills, put them in Hennessy cognac, and then brought the liquid to the Lowery's residence. When she informed Petitioner what she had done, she pointed out that they had previously discussed putting Darvocet in the drink. Jerry Lowery testified that he drank the liquid and went to the hospital as a result of his reaction to drinking the liquid. Dr. Adatsi testified about the toxic nature of large doses of Darvocet, especially when combined with alcohol.

A rational trier of fact could have concluded from the evidence, taken in the light most favorable to the prosecution, that Petitioner aided and abetted Ms. Caughill in poisoning a drink. Therefore, the state appellate court's conclusions – that "a rational jury would be justified in finding that all of the elements of the

charged offense had been proven beyond a reasonable doubt" and that Petitioner's claim lacked merit – was not contrary to, or an unreasonable application of, *Jackson*. Petitioner has no right to relief on the basis of his claim.

## I. Claim Nine:  Inconsistent Prosecution Theories

Petitioner argues next that the prosecutor's theory of his guilt was inconsistent with the prosecutor's theory about his alleged co-defendant, Daycee Caughill. The Michigan Court of Appeals found no merit in this claim.

The Supreme Court, moreover, "has never hinted, much less held, that the Due Process Clause prevents a State from prosecuting defendants based on inconsistent theories." *Bradshaw v. Stumpf*, 545 U.S. 175, 190 (2005) (Thomas, J., concurring). Thus, there is no " 'clearly established' Supreme Court . . . precedent showing that such a prosecutorial strategy would violate a defendant's due process rights." *Blalock v. Wilson*, 320 F. App'x 396, 418 n. 26 (6th Cir. 2009). Furthermore, in Michigan

> [t]o sustain an aiding and abetting charge, the guilt of the principal must be shown, but the prosecutor is not required to identify the principal nor does the principal need to be convicted. Thus, an accessory can be convicted despite the acquittal of the principal, and he can be convicted of a greater offense than the principal.

*Dixon*, 4011 WL 6187063, at *4 (internal citations omitted). In light of these principles, the prosecutor did not err in proceeding against Petitioner as an aider

and abettor and charging Petitioner with a more serious crime (attempted murder) than Ms. Caughill. Petitioner's claim lacks merit and does not warrant habeas relief.

## J. Claim Ten: Improper Admission of Irrelevant and Prejudicial Evidence

Petitioner alleges that his rights to a fair trial and due process of law were violated by the admission of irrelevant and prejudicial evidence without a proper foundation and by the prosecutor's comments on the evidence. The disputed evidence consisted of five .38 caliber bullets that the police confiscated during a search of Petitioner's sister's home. Petitioner claims that the evidence was irrelevant because there was no evidence that the bullets had any connection to him and there was no evidence that he asked Caughill to obtain a gun or to commit a murder with a gun. Petitioner also asserts that the prosecutor misled the jury and exaggerated the proofs by suggesting to the jury that Petitioner encouraged Caughill to acquire the gun and bullets as part of an alternative plan to murder.

Errors in the application of state law, especially rulings on the admission or exclusion of evidence, usually are not questioned in a habeas corpus proceeding. *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988). Habeas corpus relief may be granted only when the violation of a state evidentiary rule has resulted in the denial of fundamental fairness, thereby violating due process. *Id*.; *see also*

*McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004) ("Trial court errors in state procedure and/or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a habeas action unless the error renders the proceeding so fundamentally unfair as to deprive the petitioner of due process under the Fourteenth Amendment.") (citing *McGuire*, 502 U.S. at 69-70).

In the present case, there was evidence that Petitioner asked Ms. Caughill to get his gun and ammunition from his sister's home. Although he used code words when talking with Caughill from the jailhouse telephone, the jury could have inferred that he was referring to his gun and shells. The state trial court allowed the prosecution to admit testimony about the gun and shells because the evidence was relevant to Petitioner's intent on the charged crimes. (9/9/09 Trial Tr., at 128-30, Dkt. No. 22-8, Page ID 873-74). When defense counsel subsequently objected to evidence of the .38 caliber shells, the trial court stood by its initial ruling, (9/10/09 Trial Tr., at 456-59, Dkt. No. 22-9, Page ID 955-956), and the Michigan Court of Appeals concluded that the trial court's ruling was "a reasoned and principled decision." *Dixon*, 2011 WL 6187063, at *5.

This Court agrees that the disputed evidence was relevant to the issue of whether Petitioner intended to murder Ms. Lowery, and intent to kill was an element of attempted murder. (9/16/09 Trial Tr., at 558, Dkt. No. 22-12, Page ID

989).  Therefore, Petitioner's rights to fundamental fairness and due process of law were not violated by the admission of evidence regarding the five .38 caliber shells found at the home of Petitioner's sister.  Petitioner is not entitled to relief on his claim.

## K.  Claim Eleven:  Prosecutorial Misconduct

In his eleventh and final claim, Petitioner alleges that the prosecution violated his right to due process and a fair trial when she argued facts not in evidence, misstated evidence, offered her opinion on a witness's credibility, and bolstered Tony Bennett's testimony.  The Michigan Court of Appeals found no merit in Petitioner's prosecutorial-misconduct claims.

### 1.  Clearly Established Federal Law

"On habeas review, 'the Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.' "  *Trimble v. Bobby*, 804 F.3d 767, 783 (6th Cir. 2015) (quoting *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006)), *cert. denied sub nom. Trimble v. Jenkins*, 137 S. Ct. 41 (2016).  Consequently, although prosecutors must "refrain from improper methods calculated to produce a wrongful conviction," *Viereck v. United States*, 318 U.S. 236, 248 (1943), prosecutorial-

misconduct claims are reviewed deferentially in a habeas case, *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004).

When, as here, the issue is the prosecutor's remarks during closing arguments, the "clearly established Federal law" is the Supreme Court's decision in *Darden v. Wainwright*, 477 U.S. 168 (1986). *Parker v. Matthews*, 567 U.S. 37, 45 (2012) (*per curiam*). In *Darden*, the Supreme Court stated that

> it is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process. Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is the narrow one of due process, and not the broad exercise of supervisory power.

*Darden*, 477 U.S. at 181 (internal quotation marks and citations omitted).

Prosecutors should refrain from interjecting their personal beliefs into the presentation of their cases, *United States v. Young*, 470 U.S. 1, 8-9 (1985), and from stating a personal opinion about the credibility of witnesses. *United States v. Daniels*, 528 F.2d 705, 709 (6th Cir. 1976). But they may "argue the record, highlight any inconsistencies or inadequacies of the defense, and forcefully assert reasonable inferences from the evidence." *Cristini v. McKee*, 526 F.3d 888, 901 (6th Cir. 2008). In addition, "prosecutorial misconduct is subject to harmless-error

analysis on federal habeas review." *McCary v. Lewis*, 255 F. App'x 78, 78 (6th Cir. 2007) (citing *Macias v. Makowski,* 291 F.3d 447, 451 (6th Cir. 2002); *Pritchett v. Pitcher,* 117 F.3d 959, 964 (6th Cir. 1997)).

## 2. Application

### a. Unsworn Testimony

Petitioner alleges that the prosecutor acted as an unsworn witness when she questioned Ms. Caughill about a prosecutor's charging decisions and suggested that Petitioner was treated more harshly than Caughill due to his criminal record. The trial court initially permitted the prosecutor to pursue that line of questioning, but when defense counsel objected, the court admonished the prosecutor. The court stated that the prosecutor's questions were not appropriate because there was no basis for suggesting that Ms. Caughill knew how the criminal justice system worked. (9/10/09 Trial Tr., at 298-306, Dkt. No. 22-9, Page ID 916-18). The trial court's admonishment served to mitigate any impropriety in the prosecutor's line of questioning, and even though the prosecutor later referred to prosecutorial decision-making in her rebuttal argument (9/15/09, Trial Tr., at 538-39, Dkt. No. 22-11, Page ID 983), that was a fair response to defense counsel's comments about the scales of justice and about Petitioner being treated unfairly in comparison to Daycee Caughill, *see id.*, at 532-34, Page ID 982.

### b. Misstated Facts Not in Evidence

Petitioner also maintains that, despite evidence to the contrary, the prosecutor argued facts not in evidence or misstated the evidence when she said that Petitioner took steps to contact "Cuz" and that he told Ms. Caughill to get the Darvocet. *Id*., at 520, 539-40, Page ID 979, 983-84. Although Ms. Caughill testified that the Darvocet was her idea, there was evidence that Petitioner wanted Caughill to contact "Cuz," that Petitioner encouraged Caughill to put some kind of pills in the cognac mixture, and that Petitioner and Caughill had discussed using Darvocet. Therefore, the prosecutor did not err in arguing that Petitioner's actions were evidence of an attempt to commit murder.

### c. Violation of a Trial Court Ruling

Petitioner alleges that the prosecutor violated a court ruling when she mentioned that Ms. Caughill was not sure whether she received a post-offense letter in which Petitioner stated that Caughill should say the incident was merely a joke and that Caughill used only seven Darvocet pills. *Id*., at 501-02, Page ID 975. According to Petitioner, this violated the trial court's ruling that the letter was inadmissible to impeach Caughill. Petitioner further alleges that the prosecutor's comment implied that he coached Ms. Caughill on what to say, and that the

prosecutor expressed her personal opinion when she implied that Caughill was lying about the four things Petitioner had suggested she acquire from "Cuz."

The alleged violation of the trial court's ruling is not a basis for habeas review, *see Pulley v. Harris*, 465 U.S. 37, 41 (1984), and even if the prosecutor's comments about Ms. Caughill amounted to improper opinion testimony, there was substantial evidence that Petitioner aided and abetted Ms. Caughill in committing the crimes.

Furthermore, as the Michigan Court of Appeals pointed out on review of Petitioner's claim, the trial court instructed the jurors that it was their job to decide which witnesses to believe and how important they thought the testimony was. The court then explained how to decide which testimony was believable, using the jurors' own common sense and everyday experiences. (9/16/09 Trial Tr., at 552-54, Dkt. No. 22-12, Page ID 987-88). The jury is presumed to have followed the trial court's instructions. *Marsh*, 481 U.S. at 211; *Stanford v. Parker*, 266 F.3d 442, 459 (6th Cir. 2001). Given the jury instructions in this case and the strength of the evidence against Petitioner, the prosecutor's alleged errors were harmless.

### d. Bolstering

Petitioner contends that the prosecutor misstated the testimony and bolstered Tony Bennett's credibility when she stated that Bennett had nothing to gain from

testifying against Petitioner; that Bennett knew Caughill used gloves; and that Bennett knew who was going to poison the drink and that twenty-one Darvocet pills were used. (9/15/09 Trial Tr. at 501-02, Dkt. No. 22-11, Page ID 975).

The prosecutor obviously was trying to show that Bennett was a credible witness because he had not received anything for his testimony and because he had information that he could not have acquired from a source other than Petitioner. Although the prosecutor did mistakenly say that Bennett knew Caughill used gloves[1] and that twenty-one Darvocet pills were used,[2] these were minor factual errors, and the trial court instructed the jurors that it was their duty to determine the facts. (9/16/09 Trial Tr., at 548-49, Dkt. No. 22-12, Page ID 986).

Petitioner contends that the prosecutor also erred when she stated that Bennett had testified at the preliminary examination that Petitioner used the term "kill" when referring to what Petitioner wanted to have done. Bennett did use the word "kill" during his testimony at the preliminary examination. *See* 5/8/09 Prelim. Examination Tr., at 6-7, Dkt. No. 22-4, Page ID 771-72. Thus, the prosecutor did not err when commenting on what Bennett said at the preliminary examination.

---

[1] Bennett did not say anything about Ms. Caughill using gloves.

[2] Bennett testified that he thought twenty pills of Darvocet were used. (9/10/09 Trial Tr., at 329, Dkt. No. 22-9, Page ID 924).

Finally, even if the prosecutor's questions and remarks were improper, the trial court instructed the jury that the attorneys' arguments and questions were not evidence and that the jury should base its decision only on the evidence, which consisted of the witnesses' sworn testimony, the exhibits, and anything else the court told them to consider as evidence. (9/16/09 Trial Tr., at 550-512, Dkt. No. 22-12, Page ID 987). These instructions served to mitigate any prejudice caused by the prosecutor's remarks, because juries are presumed to have followed a trial court's instructions. *Marsh*, 481 U.S. at 211; *Stanford*, 266 F.3d at 459. The Court concludes that the prosecutor's comments did not deprive Petitioner of a fair trial and that Petitioner is not entitled to habeas relief on the basis of his claim of prosecutorial misconduct.

## IV. CONCLUSION AND ORDER

The state courts' rejection of Petitioner's claims did not result in decisions that were contrary to Supreme Court precedent, unreasonable applications of Supreme Court precedent, or unreasonable applications of the facts.

Accordingly, **IT IS ORDERED** that the Amended Petition for Writ of Habeas Corpus (Dkt. No. 18) is **DENIED**.

**IT IS FURTHER ORDERED** that a certificate of appealability is **DENIED** because Petitioner has not made "a substantial showing of the denial of a

constitutional right." 28 U.S.C. § 2253(c)(2). In addition, reasonable jurists could not disagree with the Court's resolution of his constitutional claims, nor conclude that the issues are adequate to deserve encouragement to proceed further. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).

**IT IS FURTHER ORDERED** that Petitioner may proceed *in forma pauperis* on appeal without further authorization because he was granted *in forma pauperis* in this Court (Dkt. No. 4), and an appeal could be taken in good faith. Fed. R. App. P. 24(a)(3)(A).

**SO ORDERED**.

Dated:      August 27, 2018          /s/ Gershwin A. Drain
                                     HON. GERSHWIN A. DRAIN
                                     U.S. DISTRICT JUDGE

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
August 27, 2018, by electronic and/or ordinary mail.
/s/ Tanya Bankston
Deputy Clerk